Boston and Maine Railroad, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 5756.   Promulgated June 29, 1951.

*Bernard J. Long, Esq., Norman D. Cann, Esq.,* and *Raymond J. Bowen, Esq.,* for the petitioner.
*Melvin L. Sears, Esq.,* for the respondent.

TURNER, *Judge:* The respondent has determined a deficiency of $436,799.93 in income tax against the petitioner and its affiliated corporations for the year 1941. The issues are (1) whether in computing deductions claimed for 1939, 1940, and 1941, on account of the retirement of items of roadway property, the petitioner has used proper bases for the items of such property owned at March 1, 1913; (2) whether the basis of property acquired prior to March 1, 1913, and retired during the years stated, should include engineering costs; (3) whether deductions claimed by reason of the retirement of various units of roadway property have been claimed for the proper year or taxable period; and (4) whether the petitioner is entitled to a deduction of $438,613.55 as a liability accrued in 1941 for vacation payments to employees. Under Issue (3), all of the claimed deductions except one, that involving the retirement of property by the Franklin & Tilton Railroad, are in issue by reason of affirmative allegations appearing in the respondent's answer, as the basis of a claim for an increased deficiency. The years 1939 and 1940 are involved because of claimed operating net loss carry-overs. Issue (4) has been conceded by the respondent.

### General Findings of Fact.

The petitioner is a corporation organized and existing under the laws of the States of Maine, New Hampshire, New York, and the Commonwealth of Massachusetts. On behalf of itself and certain affiliated corporations, it filed consolidated corporation income and excess profits tax returns for 1939, 1940, and 1941, with the collector for the district of Massachusetts

The petitioner was organized in 1841, and in 1843 began the operation of its first section of railroad, which was between Wilmington, Massachusetts, and South Berwick, Maine, and about 70 miles in length. During the years involved herein, it operated in the States of Maine, Massachusetts, New Hampshire, Vermont, and New York. In 1948, it operated 1,757 miles of railroad and employed approximately 13,450 employees.

For the year 1941, the petitioner paid income taxes on the dates and in amounts as follows:

| | |
|---|---:|
| March 24, 1942 | $88,000.00 |
| June 17, 1942 | 107,903.02 |
| September 29, 1942 | 97,951.51 |
| December 18, 1942 | 97,951.52 |
| Total | $391,806.05 |

*Issues (1) and (2)—Depreciation and Engineering Costs Prior to March 1, 1913.*

FINDINGS OF FACT.

Since the creation of the Interstate Commerce Commission, in 1887, petitioner has been subject to the rules and regulations prescribed from time to time by that agency. With the approval of the Commission, petitioner and its affiliated corporations have employed a method of accounting commonly known as the retirement method of accounting.

The petitioner's books as now kept and as kept during 1939, 1940, and 1941, were set up pursuant to an order of the Interstate Commerce Commission which became effective July 1, 1914. By this order, its properties which are devoted to transportation service were classified under the heading Investment in Road and Equipment, which in turn was divided into three general accounts as follows: I Road, II Equipment, and III General Expenditures. The general account designated Road was divided into 47 primary accounts.[1]

To guide the railroads in setting up and maintaining the various primary accounts under the classification Investment in Road and Equipment, the Commission issued detailed instructions. Under General Instructions, the introductory paragraph was as follows:

The carrier's records shall be kept with sufficient particularity to show fully the facts pertaining to all entries made in the accounts provided herein for Investment in Road and Equipment. Where the full information is not recorded in the general books, the entries therein shall be supported by other records in which the full details shall be shown. Such general book entries shall contain sufficient reference to the detailed records to permit ready identification, and the detailed records shall be filed in such manner as to be readily accessible for examination by representatives of the Interstate Commerce Commission.

Under items to be charged, it was provided that the appropriate account should be charged with "the cost of original road, original equipment, road extensions, additions, and betterments; also the estimated values at time of acquisition of right of way and other road and equipment property donated to the carrier, except that unless au-

---

[1] Engineering; Land for Transportation Purposes; Grading; Underground Power Tubes; Tunnels and Subways; Bridges, Trestles and Culverts; Elevated Structures; Ties; Rails; Other Track Material; Ballast; Track-Laying and Surfacing; Right-of-way Fences; Snow and Sand Fences and Snow Sheds; Crossings and Signs; Station and Office Buildings; Roadway Buildings; Water Stations; Fuel Stations; Shops and Engine Houses; Grain Elevators; Storage Warehouses; Wharves and Docks; Coal and Ore Wharves; Gas Producing Plants; Telegraph and Telephone Lines; Signals and Interlockers; Power Dams, Canals and Pipe Lines; Power Plant Buildings; Power Substation Buildings; Power Transmission Systems; Power Distribution Systems; Power Line Poles and Fixtures; Underground Conduits; Miscellaneous Structures; Paving; Roadway Machines; Roadway Snow Tools; Assessments for Public Improvements; Revenues and Operating Expenses During Construction; Cost of Road Purchased; Reconstruction of Road Purchased; Other Expenditures—Road; Shop Machinery; Power Plant Machinery; Power Substation Apparatus; and Unapplied Construction Material and Supplies.

thorized by the Commission no charges shall be made to these accounts after July 1, 1914, for donations received previously to that date." If the total cost of additions or betterments to any class of fixed improvements, except tracks, considered as a whole should be less than $200, the carrier was to have the option of charging the amount so expended to the appropriate account in Operating Expenses.[2] It was specified that "*Costs* shall be actual money costs to the carrier," with a subsequent provision, under Basis of Charges, that "When the consideration given for the purchase or the improvement of property the cost of which is chargeable to the accounts of this classification is other than money, the money value of the consideration at the time of the transaction shall be charged to these accounts, and the actual consideration shall be described in the record in sufficient detail to identify it. The carrier shall be prepared to furnish the Commission, upon demand, the particulars of its determination of the actual cash value of the consideration, if other than money."

With respect to Property Retired and Replaced, it was provided that the ledger value of the retired property should be credited to the appropriate primary account. The amount so credited was then to be applied as a charge to the credit balance in the accrued depreciation balance-sheet account with respect to the property thus retired and "the remainder (less salvage and insurance recovered, if any), together with the cost of demolishing the property," was to be charged to the appropriate operating expense account. If, however, the property retired was of minor importance and was replaced in kind without betterment, the cost of replacement was to be charged to operating expense accounts without any adjustment in the primary Road accounts. If authorized by the Commission, a carrier was privileged to charge the cost of any extraordinarily large item directly to Profit and Loss, instead of Operating Expenses.

In the case of Property Retired and not Replaced, it was provided that the ledger value thereof should be credited to the appropriate property account and the amount so credited should be charged first to the credit balance in the accrued depreciation balance-sheet account for the property so retired, and next, the "remainder (less salvage and insurance recovered, if any), together with the cost of demolishing the property," to the appropriate profit and loss account.

Due allowance being made for the time required to set up its books of account, pursuant to the order of the Interstate Commerce Commission which became effective July 1, 1914, the petitioner has since that date kept and maintained its books of account in substantial compliance with the requirements of the order. Among other things, the

---

[2] Over a period of time, not specified of record, the limiting amount under the practice outlined has ranged from $100 to $500.

order permitted railroads to elect whether to account for depreciation by the retirement method of accounting, or to use a method of accounting which would normally reflect depreciation on capital items by means of a depreciation account. The petitioner and its affiliated corporations elected to continue accounting for depreciation under the retirement method of accounting and have employed that method through the years here involved. Consequently, the direction that the amounts credited to the property accounts covering retirements and replacements be charged to the accrued depreciation balance-sheet account does not apply to petitioner. In giving effect to the instructions covering property retired and replaced, the petitioner has established a practice of charging the cost of the replacement to the appropriate operating expense accounts, with no adjustment to its roadway capital accounts, where the replacement does not constitute the major portion or is not in excess of 50 per cent of the unit of property affected.

By the terms of the Act of March 1, 1913, commonly referred to as the "Physical Valuation of Property Act," the pertinent parts of which now appear as section 19a, Chapter I, Title 49, U. S. C. A., the Interstate Commerce Commission was directed to "investigate, ascertain, and report the value of all the property owned or used by every common carrier" subject to regulation by the Commission. In subsection (b) of the said section, it was provided that, "In such investigation said commission shall ascertain and report in detail as to each piece of property, other than land, owned or used by said common carrier for its purposes as a common carrier, the original cost to date, the cost of reproduction new, the cost of reproduction less depreciation, and an analysis of the methods by which these several costs are obtained, and the reason for their differences, if any."

Prior to July 1, 1914, petitioner kept no books showing the cost of individual items of its road properties. It did carry on its books an investment account reflecting a book cost for such properties as a whole. In the beginning, it had charged newly acquired or constructed property to a "Construction Account." Thereafter repairs to, and renewal and replacements of, such properties were charged to operating expenses. This left in the "Construction Account" as the cost of the property on hand the amount which had originally been entered therein, even though the cost of the replacement differed materially from the amount at which it was carried in the account. There was no writing out of the "Construction Account" of any amount as the cost of the property retired and replaced and a charging thereto of the actual cost of replacement as was required from and after July 1, 1914. After the creation of the Interstate Commerce Commission, orders relating to the keeping of accounts were issued at

various times, specifically in 1907 and 1910, but petitioner's road properties investment account was continued substantially as described, showing an aggregate or lump sum as the investment in road properties. In setting up the 47 primary roadway property accounts as of July 1, 1914, petitioner did not discontinue the over-all or lump sum investment account and its roadway properties as of that date were continued in the said general ledger investment account without change. Entries thereafter made in the investment account with respect to items of property subsequently acquired or installed were made in conformity with the corresponding charges and credits made to the 47 primary accounts.

Pursuant to the above statutory direction, the Interstate Commerce Commission made a physical inventory and valuation of all of petitioner's property as of June 30, 1914. The taking of the inventory extended over 1914, 1915, and 1916. All of petitioner's physical properties were included in the inventory and in that respect no distinction was made between properties the cost of which had been charged to capital accounts and those the cost of which had been charged to expense. As thus made, the inventory included property not reflected in petitioner's investment account, and to the extent that property which had originally been charged to the investment account had been replaced or retired without its cost having been written out of the investment account, the investment account covered property that was not in existence and was not contained in the inventory.

The inventory was taken by specialists in the respective types of property covered. Notes were made giving the history of the property to the extent possible. They contained pertinent comment on the physical condition of the properties when related to age and use and as to their prospective useful life. Upon completion of the inventory, a copy thereof with the notes made was given to the petitioner.

After the physical inventory was completed, a tentative engineering report was prepared by the Bureau of Valuation of the Interstate Commerce Commission. In this report the petitioner's properties as of June 30, 1914, were classified and set up by units according to the 47 primary accounts established as of that date. The cost of the properties shown by the report was estimated cost of reproduction new and estimated cost of reproduction new less depreciation. The estimated unit cost prices were developed from studies made by the Interstate Commerce Commission of similar properties and of construction costs obtained from all carriers, including costs disclosed by petitioner's latest available invoices. For the purpose of pricing inventories, the Commission had divided the United States into districts, the petitioner being placed in the eastern district. Petitioner was furnished with a copy of the tentative engineering report and after

examining it, filed with the Commission exceptions thereto together with a statement of its supporting grounds.

Numerous hearings extending over a goodly number of years were had before the Interstate Commerce Commission on the engineer's report and the petitioner's exceptions thereto. The final decision of the Commission was made on July 12, 1930, and is reported in Volume 30 of the Valuation Reports of the Interstate Commerce Commission at page 515. The Commission found and determined that the cost of reproduction new of petitioner's road properties at June 30, 1914, was $125,325,554 [3] and that cost of reproduction new less depreciation sustained was $98,837,926. The absence of a finding of the original cost of the said properties called for by section 19a (b) of the Valuation of Property Act, *supra*, was explained in the published report at page 561 as follows: "The original cost to date of the carrier's common-carrier property can not be ascertained, owing to the insufficiency of the accounting records." The report then gave a resume of recorded money outlay, short term notes, outlay in par value of securities, "outlays, considerations undetermined," outlay in investment securities at par, and the recorded dollar amount covering property retired and property sold. It was then stated: "It is not known to what extent the amounts set forth above include the cost of the noncarrier lands and other noncarrier physical property. It also is not known whether further deductions should be made for property retired or abandoned."

Under the order issued in 1914, petitioner was required to perpetuate its June 30, 1914, inventory according to the 47 primary accounts established and at the values as finally determined by the Commission in 1930. It did not, however, make any adjustment in its over-all or general ledger road properties investment account as of June 30, 1914, to conform it with the physical inventory and valuation, but continued the account as of that date at the amount and in the state in which it then stood.

Of the 47 primary roadway property accounts set up as of July 1, 1914, by order of the Interstate Commerce Commission, account No. 1, Engineering, was designed to reflect the engineering costs attributable to the construction or acquisition of Road properties. In taking the inventory and placing their value thereon, the Commission's engineers were instructed to fix engineering costs between a minimum of 2 per cent and a maximum of 10 per cent of the costs determined for the properties entered in primary accounts Nos. 3 to 47, inclusive and exclusive of account No. 2, covering Land. In arriving at the engineering rate, consideration was to be given to the terrain through

---

[3] This amount includes properties which at June 30, 1914, belonged to seven subsidiary or lessor companies but which were acquired by petitioner in 1919 in a stock-for-stock exchange and carried into its books at the same basis as they stood on the books of the prior owners.

which the road extended. In determining reproduction cost new of petitioner's properties, the Commission fixed the rate for engineering which was to be applied to accounts Nos. 3 to 47 at 4½ per cent.

Under the Commission order effective as of July 1, 1914, the pay and expenses of engineers, assistants, and clerks engaged in the survey and amounts expended in the construction of new lines and extensions or in making additions and betterments to roads, including wharves and docks, were among the charges which were to be made to account No. 1, Engineering. Upon the retirement of any unit of road property, credit to the account of an amount equal to the cost of engineering attributable to the construction of such unit is required.

In the consolidated income tax returns filed by petitioner and its affiliated corporations for 1939, 1940, and 1941, deductions were taken as losses sustained by reason of the retirement in the said years of numerous items of roadway property. Some of the items retired had been acquired or constructed prior to June 30, 1914, and some after that date. Deductions for the items acquired or constructed after June 30, 1914, were made at cost. As to items constructed or acquired prior to June 30, 1914, deductions were made at cost where through the use of historical data or other matter it was possible to determine cost. As to most of such items, it was not possible to determine cost and the deductions taken were based on cost of reproduction new as finally determined by the Interstate Commerce Commission.

At June 30, 1914, the book cost of petitioner's road properties, as shown by its general ledger investment account, was $124,778,152, as against $125,325,554 determined by the Interstate Commerce Commission as their cost of reproduction new as of that date. In computing its deductions in 1939, 1940, and 1941, by reason of the retirement of items of such property, the actual cost of which could not be determined, petitioner first obtained a factor by relating the amount at which the particular item stood in the Interstate Commerce Commission inventory to $125,325,554, the reproduction cost new as determined for the whole inventory, and then applied that factor to $124,778,152, the book cost of its road properties as it appeared in the general ledger investment account.

In his report of his examination and audit of petitioner's returns for 1939, 1940, and 1941, the revenue agent proposed certain adjustments to the basis of the items of retired roadway property acquired prior to March 1, 1913, on account of which loss deductions had been taken. In explanation of these adjustments, the report contained the following:

* * * The cost used by the taxpayer shown in Exhibit G of this report is a combination of actual costs in some instances and I. C. C. values, adjusted up or down for various reasons, in other instances. The costs adjusted in Exhibit G are only with relation to assets acquired prior to March 1, 1913. The circumstances leading to this adjustment are as follows:

In the majority of cases it is impossible to identify book cost of acquisitions made prior to March 1, 1913 due to the lack of records and lack of account classification.

In the settlement of prior years 1928 to 1931 it was disclosed that the I. C. C. valuation of Roadway properties as of July 1, 1914 and book values showed the following comparison:

|  |  | Per cent |
|---|---|---|
| I. C. C. Cost of reproduction new | 125, 325, 554 | 100. 00 |
| I. C. C. Cost of reproduction less depreciation | 98, 837, 926 | 78. 86 |
| I. C. C. Cost Percent depreciation | 26, 487. 628 | 21. 14 |
| Book Value | 124, 778. 152 | 99. 95 |
| Book Depreciation | none | —— |
| Difference between I. C. C. cost of reproduction new and books | 547, 402 | . 05 |

The Revenue Agent and Revenue Agent Engineer examining those years concluded that since the difference between I. C. C. value "cost new" and book value was less than one-half of one per cent of [sic] the I. C. C. value should for all practical purposes be accepted for retirement purposes as cost. This cost to be reduced by depreciated cost, which for practical purposes was agreed to be 21%.

Based upon the above the retirement losses for the years 1928 to 1933 were allowed by the Revenue Agents in the following manner:

1. I. C. C. cost of reproduction new
2. Less estimated I. C. C. Engineering cost of 4½%
3. Less 21% depreciation prior to Mar. 1, 1913 (see note)

For the years here under examination, 1939, 1940 and 1941, the retirement losses have been recomputed by the taxpayer's engineering department, examined so far as practical by this examiner and accepted, and a summary of the results are set forth in Exhibit G of this report.

The taxpayer prepared these results at the request of the examiner but does not agree to the principal [sic] of reducing the I. C. C. "cost of reproduction new" in any manner.

Note: It should be noted that railroads using retirement accounting in lieu of depreciation of roadway are required under the provisions of Bureau Bulletin "F" (Refixed [sic] Jan. 1942) classification "378 Steam Railroads," to reduce costs by prior to Mar. 1, 1913 depreciation.

In his notice of deficiency, the respondent accepted the retirement method of accounting as a proper method for reporting petitioner's income for 1941 and in computing its operating net loss carry-overs from 1939 and 1940, provided the deduction claimed for losses due to retirement of property acquired prior to March 1, 1913, be adjusted to eliminate depreciation sustained prior to that date and engineering costs. The adjustments made by the revenue agent to eliminate engineering costs and pre-March 1, 1913 depreciation with respect to retirements of property acquired prior to March 1, 1913, were approved. The over-all result was an increase in the retirement deductions for 1939 and substantial decreases therein for 1940 and 1941.

OPINION.

Our first question is whether petitioner has properly and correctly computed and determined the deductions to which it was entitled

for items of roadway property retired during the years 1939, 1940, and 1941.

During the years in question, the petitioner kept its books of account and reported its income by what is commonly denominated the retirement method of accounting. The accounts as kept during the said years were set up and established as of July 1, 1914, pursuant to an order of the Interstate Commerce Commission. Roadway properties are classified and carried in 47 primary accounts. It is required that records "be kept with sufficient particularity to show fully the facts pertaining to all entries" in those roadway accounts, and further, that entries made be made at actual money costs to the carrier. Charges are made to these primary capital accounts to cover "the cost of original road, original equipment, road extensions, additions and betterments." If, however, the cost of the item does not exceed a fixed amount, petitioner has the option of charging the amount to operating expense instead of investment. At July 1, 1914, this amount was fixed at $200, although over a period of time, not specified, it has ranged from $100 to $500. Another exception to the rule that such costs be charged to the appropriate capital account, is where the replacement does not constitute the major portion or is not in excess of 50 per cent of the unit of property affected. In such cases, the costs are charged either against current operations or directly to profit and loss. Under this method of accounting no depreciation account is maintained, but rather, the depreciation actually sustained is absorbed or accounted for by charging the capital items just described directly to expense or profit and loss and by crediting to the appropriate capital account at the time of retirement the original cost of the unit of property retired and the making of a corresponding charge to expense. The theory of this method of accounting is that although no depreciation is charged, as such, the capital accounts will as reasonably reflect the current investment in roadway properties at any given date as would be true if a specifically designated depreciation account were established and maintained by the "straight-line" or some other acceptable method. *Commissioner* v. *Union Pacific Railroad Co.*, 188 F. 2d 950, remanding 14 T. C. 401; *Southern Railway Co.* v. *Commissioner*, 74 F. 2d 887; *Los Angeles & Salt Lake Railroad Co.*, 4 T. C. 634; *Cincinnati Union Terminal Co.*, 44 B. T. A. 905; *Chicago North Western Railway Co.*, 39 B. T. A. 661, affd., 114 F. 2d 882; and *Central Railroad Co. of New Jersey*, 35 B. T. A. 501.

That the method of accounting used by petitioner from and after July 1, 1914, and insofar as it related to installations or acquisitions after that date, did properly reflect income and account for depreciation sustained, is not here in dispute. The parties are not in accord, however, as to the sufficiency of petitioner's accounts prior to that date. The petitioner finds for itself an adequate and satisfactory

answer to the problem in two simple statements: first, that the retirement method of accounting for roadway properties is well recognized and established and properly reflects income; and second, that from the beginning up through the years here in question, it has used the retirement method of accounting and in keeping therewith it has correctly computed and determined the amounts of the deductions allowable in 1939, 1940, and 1941, by reason of the retirement in those years of items of roadway property installed prior to March 1, 1913.

It is the claim of the respondent that petitioner's accounts at March 1, 1913, and up to July 1, 1914, did not carry or reflect original cost of its roadway properties owned and in use either at March 1, 1913, or the close of business on June 30, 1914. He accordingly takes the position that the deductions claimed are not in fact the deductions allowable under the retirement method of accounting, that the deductions allowable under that method are not determinable from the evidence of record, and that in such case the amount of the deductions which may be allowed can be arrived at only through application of the principle declared and established in *Cohan* v. *Commissioner*, 39 F. 2d 540. He further contends that pursuant to the provisions of section 113 (b) (1) (C) of the Internal Revenue Code,[4] cost when determined must be adjusted for deprecation "to the extent sustained" to March 1, 1913, and that such adjustment is required regardless of the method of accounting used by petitioner.[5]

At this point it may be well to note that at March 1, 1913, and prior to July 1, 1914, petitioner kept no books showing costs of its road

---

[4] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property ; * * *

* * * * * * *

(b) ADJUSTED BASIS.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

(1) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made—

* * * * * * *

(C) in respect of any period prior to March 1, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent sustained ;

SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

(a) BASIS FOR DEPRECIATION.—The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113 (b) for the purpose of determining the gain upon the sale or other disposition of such property.

[5] There is no claim by either party that section 113 (a) (14) of the Code is applicable.

SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property ; except that—

* * * * * * *

(14) PROPERTY ACQUIRED BEFORE MARCH 1, 1913.—In the case of property acquired before March 1, 1913, if the basis otherwise determined under this subsection, adjusted (for the period prior to March 1, 1913) as provided in subsection (b), is less than the fair market value of the property as of March 1, 1913, then the basis for determining gain shall be such fair market value. In determining the fair market value of stock in a corporation as of March 1, 1913, due regard shall be given to the fair market value of the assets of the corporation as of that date.

properties comparable to the 47 primary accounts set up and maintained after July 1, 1914. As a consequence, the parties to a substantial extent appear to have accepted facts existing at June 30 or July 1, 1914, as being reflective of facts existing at March 1, 1913. At any rate, the questioning of witnesses and the presentation of arguments have, in most instances, revolved around the June 30 and July 1, 1914, dates, rather than March 1, 1913, and it is our understanding that the differences between the parties do not turn on any factual difficulties as between the 1914 dates and March 1, 1913.

As to the respondent's contention that section 113 (b) (1) (C), *supra*, is applicable regardless of the method of accounting used, we think it well settled that where the retirement method of accounting is properly and correctly established and maintained the original cost of items of roadway property installed prior to March 1, 1913, is not to be reduced by depreciation sustained to that date in computing and determining the amount of deduction to which a railroad is entitled upon the retirement of such property. The reason is that an accounting has already been made for the depreciation sustained through the direct charge to expense or profit and loss of expenditures which under other methods of accounting would have been capitalized and through the prior retirement, over the life of the property currently being retired, of other items of roadway property at their original costs. *Commissioner* v. *Union Pacific Railroad Co.*, *supra; Southern Railway Co.* v. *Commissioner, supra; Los Angeles & Salt Lake Railroad Co., supra; Cincinnati Union Terminal Co., supra; Chicago & North Western Railroad Co., supra;* and *Central Railroad Co. of New Jersey, supra.* To hold in such circumstances that the original cost of the items currently being retired must also be reduced for depreciation sustained to March 1, 1913, would, in effect, be to require a railroad to make a double adjustment of the basis of its properties for depreciation.

That is not to say, however, that this petitioner is entitled to the retirement deductions as claimed. For all practical purposes, the resemblance between petitioner's accounts as they existed up to July 1, 1914, and its accounts as established and maintained on and after that date is chiefly due to the name and theory of the method of accounting used and not to the comparability of the details or substance of the facts recorded. Excluding the few instances where cost could be determined from historical data, it is not only impossible on the record here to determine the actual or original cost, but it is also impossible to find the book cost of the pre-March 1, 1913 roadway items retired in 1939, 1940, and 1941. As to the bulk of the items retired, it appears that the deductions claimed were first computed on the basis of the 47 primary accounts and that in these primary accounts the pre-March 1, 1913, roadway properties were carried according to the June

30, 1914, inventory and valuation made by the Interstate Commerce Commission, and not at original cost as required by the retirement method. Furthermore, the inventory was a physical inventory of all property owned and in use at June 30, 1914, and it not only contained items of property which were carried in petitioner's investment account, but also contained items of property the cost of which had been charged to expense at the time acquired or installed and had not been charged to the investment account, and, so far as appears, no distinction was made in computing the retirement deductions for property retired between items the cost of which had been fully expensed and items which had been charged to investment at some figure. Where, as in most cases, it was not possible to determine actual or original cost of an item of pre-March 1, 1913, or pre-June 30, 1914, property, it was eliminated from the appropriate primary account at the amount at which it was valued in the physical inventory, which was estimated cost of reproduction new at June 30, 1914. A factor was then arrived at and applied to the general ledger investment account as it stood at June 30, 1914, to determine the amount of the deduction claimed by reason of the retirement of the particular property. In other words, as to most of the pre-March 1, 1913, items of property retired in the years 1939, 1940, and 1941, there is no way of telling what the original cost—the amount at which under the retirement method of accounting an item of retired property is to be written out of the investment account—was, or whether or to what extent the original cost of the retired item appeared in the investment account at all.

Petitioner seeks to justify the deductions claimed by pointing out that where it was not possible to determine the cost of property retired it claimed only a pro rata part of the amount at which its entire roadway properties stood on its books at June 30, 1914, and seemingly feels that since book cost represents the balance of the amounts charged as cost, which at June 30, 1914, had not been written out of the investment account, such book costs are not, under the above decisions, now open to question.

The cases in question do not stand for such a proposition and that such a view is not sound is in our opinion made clear by the remand for further proceedings in *Commissioner* v. *Union Pacific Railroad Co.*, *supra*.

The most that can be said of the balance standing in petitioner's roadway investment account at June 30, 1914, is that it represented book cost of petitioner's road at that date. Its relationship to the original cost of the items covered, which is the cost that would have been reflected by properly established and maintained retirement accounting, is an unknown factor. Actually about all we know is that the balance shown on the books at that date as petitioner's investment in roadway properties was $124,778,152, whereas the cost of repro-

duction new as of the same date of all of petitioner's physical properties, whether reflected in book cost or not, as determined by the Interstate Commerce Commission, was $125,325,554.

With respect to the valuation of the physical inventory, it is significant to note that the inventory was taken and the valuation was made under Congressional mandate and one of the specific directions was that original cost of the various items of roadway property then owned and in use be determined. Presumably the Congress was of the view that as a general matter the property accounts of the railroads of the Nation did not clearly reflect the investment of the railroads therein, and certainly the Interstate Commerce Commission, in the case of petitioner, determined that its accounts did not. The Commission could not, according to the report, determine original cost because of the insufficiency of accounting records. It further indicated that the "outlays," to the extent shown, were to substantial and varying degrees in terms of par value of securities both of petitioner's own issue and of investment securities and of "considerations undetermined." It was able to find a dollar amount representing property retired and property sold, but it was then stated, "It is not known to what extent the amounts set forth above include the cost of the noncarrier lands and other noncarrier physical property. It also is not known whether further deductions should be made for property retired or abandoned." In such circumstances, it is not possible to hold that as to pre-March 1, 1913, property retired in 1939, 1940, and 1941, the accounts of petitioner properly reflected the amounts deductible therefor.

Some further support for the conclusion stated is, we think, found in a comparison between the book balance in the roadway investment account at June 30, 1914, and the valuation made as of that date by the Interstate Commerce Commission. Comparatively, there was a very small difference in the book balance and the Interstate Commerce Commission valuation, and yet the valuation was at estimated cost of reproduction new as of the inventory date of each and every item of property owned and in use, even though some of them were not represented in the book balance at all, and to complicate the situation further, the Commission declared that it could not determine that all of the properties previously retired had been written out of the investment account. It is thus apparent that to the extent that items retired in 1939, 1940, and 1941, on the basis of their presence in the June 30, 1914, inventory, had already been charged to expense, petitioner, by its method of computing the retirement deductions for pre-March 1, 1913, property, would in effect be getting a double deduction, and in the case of property previously retired but not written out of the investment account would in the case of each deduction determined pro rata be getting a deduction in the years in

question for property which it had retired prior to June 30, 1914. In addition to the examples thus given, there is no way of knowing what the margin of difference would be between actual cost and book cost of items carried into the investment account at the par value of securities issued or given for the said items, or of the items shown as having been acquired for "outlays, considerations undetermined." Certainly it follows that, unless construction costs at June 30, 1914, were substantially lower than at the dates of the previous "outlays," the book cost shown at $124,778,152 contains substantial amounts over and above the original or actual cost of the property items which properly it should be regarded as covering.

As his starting point, the respondent in his determination has adjusted all retirements in the years here in question to the estimated cost of reproduction new and the figures represented thereby are not in dispute. The amounts so determined he has further reduced by eliminating estimated engineering costs as shown by the Interstate Commerce Commission, and by 21 per cent to cover depreciation. If his starting point had been original cost, then certainly he would not have been permitted to make the adjustment for depreciation, since by the retirement method of accounting depreciation would already have been accounted for. *Commissioner* v. *Union Pacific Railroad Co., supra.* As it is, however, we do not know what original cost was and accordingly we are not able to conclude and find on this record that the deductions for the items retired if correctly determined by the retirement method of accounting would as a whole have exceeded the amounts allowed by respondent in his determination.

As to his elimination of engineering costs, respondent's position is that retirement of the particular physical property did not retire the engineering therein and that that part of cost represented by engineering must be eliminated in determining the deduction allowable. The difficulty with such a position is that as to the properties here retired the evidence indicates that the facts were otherwise and whatever cost petitioner had for engineering was lost upon retirement of the properties. By respondent's own theory, then, the amounts representing engineering costs should be restored to the deductions allowed.

*Issue (3)—Deductions Claimed by Reason of Retirement of Units of Roadway Property.*

FINDINGS OF FACT.

Property retired has been defined by the Interstate Commerce Commission as "property which is sold, abandoned, demolished, or otherwise withdrawn from transportation service."

In the case of roadway properties, the proposal that an item of property be retired usually originates in petitioner's engineering department. When in connection with the retirement of property the expenditure of money is required, a request for authority to make the expenditure is studied and passed on by a budget committee. If the estimated expenditure is $1,500 or less, approval by petitioner's president is final. If the estimated expenditure exceeds $1,500, approval is required by the executive committee of the board of directors, the highest authority in the management of petitioner's affairs.

Proposals for retirement requiring the approval of the Interstate Commerce Commission are usually studied by special committees and discussed at staff meetings, after which they are submitted to petitioner's president for action. If they meet with his approval, they are then submitted to the executive committee. If that committee approves, they are turned over to the law department, which handles matters before the Commission.

Permission of the Interstate Commerce Commission must be obtained for the retirement of roadway property constituting a line of railroad. It is not required with respect to switching, industrial, spur and side tracks. The types of property for the retirement of which state approval is required are not, in all respects, the same as those requiring approval by the Interstate Commerce Commission and include industrial tracks, stations, bridges, and crossing structures. Other properties may be retired upon the decision of the management of the railroad, without approval of the Interstate Commerce Commission or state authorities.

After the approval of a retirement, the accounting department assigns an Authority For Expenditure number, which is generally referred to as an AFE number. The number given is recorded in a register in the accounting department. Thereafter, all charges in connection with the particular item for labor, material, or other matters connected therewith are recorded in the accounting department under the number assigned.

In the case of an emergency, the retirement project is given an emergency number, commonly referred to as an E number. Emergency numbers are issued on the approval of petitioner's vice president. Among the cases to which E numbers are given, are those where the Interstate Commerce Commission has approved a retirement and some preliminary work is necessary prior to beginning actual demolition and those where expenditures are recoverable from the Federal Government or from a state.

In some instances, applications to the Interstate Commerce Commission and state authorities are at first made for abandonment of operations only. One instance is where it is thought that operations by bus and truck will best serve the needs of the road and public, but there is opposition to abandonment of rail service. Application is then made to substitute bus and truck service and thereby convince the protestants of the merits of the proposal. If by that means the opposition to abandonment of rail service is dissipated, steps for physical retirement of the facilities can follow. Another illustration is where comparable service can be given over the facilities of another road. If joint operation with the other road proves satisfactory, and a contract is obtained which amply protects petitioner in such joint operation, petitioner can then take steps to retire its own line.

In at least one instance a branch line was taken out of operation, but at a later date was again put in operation.

When an item of road property is physically retired, the engineer in charge or the division engineer, enters upon Form A & B 26, prescribed therefor, data relating to the work of demolition. The units of property are listed and the dates when the work was commenced and when completed are shown. Copies of this form are sent to the petitioner's auditor of disbursements and to the engineering department. The division engineer also submits to the engineering department a form, ED 255, which contains a description of the item or items of property by kinds, units and quantities. Upon receipt of this form, the valuation engineer determines the ledger value of the property retired by primary accounts and enters the same upon Form ED 252, which is then transmitted to the accounting department. Upon receipt of Form ED 252 in the accounting department, the ledger value shown thereon for the property retired is credited to petitioner's account for Investment in Road and Equipment and the amount so credited, adjusted for costs of demolition and credits for salvage, is charged to profit and loss. The credits are broken down by primary accounts. Costs of demolition and credits for salvage recoveries are currently kept on a separate Form AD–R 8.

Regardless of the time of completion of demolition and salvage of an item of roadway property, the retirement of the property is reflected or given effect for the year in which the book entries are actually made, which in most cases is the year in which Form ED 252 is received in petitioner's accounting department. As a result, the actual or physical retirement of property is at times completed in

one year but is entered on petitioner's books as having occurred in a later year. Petitioner's general retirement deduction practice is to take retirement deductions, for income tax purposes, for the year in which the entries are made, regardless of the year of actual retirement. There have been instances, however, where entries reflecting retirement have been made in advance of completion of demolition and salvage operations. In such cases, the costs of demolition and the amount of salvage are estimated, and when the demolition and salvage operations are concluded, adjusting entries are made in the books.

*1939*

On the 1939 consolidated return, petitioner claimed, and in computing the operating net loss carry-over, the respondent in his determination of deficiency allowed, loss deductions due to claimed retirements in that year of various items of roadway property. Ten of these items are now in issue, by reason of affirmative allegations by the respondent claiming an increased deficiency. The ten items, by AFE numbers and cost or I. C. C. inventory value, salvage recoveries, demolition costs, and the deductions allowed by the respondent in his deficiency determination, are as follows:

| AFE numbers | Cost or I. C. C. inventory value | Salvage recoveries | Demolition costs | Deductions* allowed by respondent |
|---|---|---|---|---|
| 17655 | $5, 423. 00 | $716. 73 | $497. 51 | $3, 901. 10 |
| 17778 | 490, 101. 00 | 24, 349. 99 | 9, 202. 04 | 368, 404. 07 |
| 17843 | 162, 294. 00 | 18, 955. 62 | 4, 974. 57 | 120, 745. 80 |
| 17844 | 181, 105. 00 | 20, 740. 32 | 6, 512. 60 | 139, 395. 07 |
| 17897 | 26, 769. 00 | 3, 711. 66 | 2, 207. 95 | 19, 349. 71 |
| 18000 | 16, 674. 00 | | | 12, 773. 21 |
| 18279 | 200, 775. 00 | 9, 043. 27 | | 145, 125. 40 |
| 18301 | 1, 037, 309. 00 | 32, 894. 41 | | 782, 418. 39 |
| 18349 | 78, 098. 27 | 3, 598. 86 | | 58, 686. 31 |
| 18350 | 213, 998. 97 | 12, 932. 51 | | 152, 010. 08 |
| Total | $2, 412, 547. 24 | $126, 943. 37 | $23, 394. 67 | $1, 811, 809. 14 |

*In arriving at the deductions allowed in his deficiency determination, the respondent adjusted the cost or I. C. C. inventory value of each item of property for pre-March 1, 1913, depreciation and engineering costs.

AFE 17655 covers the retirement of a passing track and spur track at Bridgewater, New Hampshire. On October 13, 1937, the division engineer requested authority to retire these tracks for the reason that they were of no further use and that their retirement would eliminate expense of maintenance. Retirement was authorized by petitioner's president on February 28, 1938. Physical retirement was commenced October 12, 1938, and was completed on December 16, 1938. The division engineer made his report on January 25, 1939, and the engineering department transmitted its statement of the ledger value of the property retired to the auditor of disbursements on February 14, 1939. Entries recording the retirement of the tracks were made in

petitioner's accounts in February 1939. The demolition costs were $497.51 and salvage recoveries were $716.73, all in 1938.

AFE 17778 covers the retirement of petitioner's Mt. Washington Branch, exclusive of Fabyan Yard. There had been no train service over the Mt. Washington Branch after July 15, 1932, when service was abandoned, as authorized by the Interstate Commerce Commission. On January 18, 1938, the executive committee authorized the president to apply to the Commission for authority to abandon and retire the physical property, and on February 3, 1938, application for such authority was filed. Among other things, petitioner represented to the Commission that no useful purpose was served by continuance of the line and that it was desired to dismantle the line before it got into such condition that it would not be possible to send work trains over it for the purpose of salvaging useful material, and further, that it was desired to salvage the material for sale or use elsewhere before it deteriorated further. Dismantling of the road was authorized by the Commission on April 21, 1938. The work of removal was commenced on July 8, 1938, and was completed on November 30, 1938. The division engineer made his report on January 25, 1939. Entries recording retirement of the branch were made in petitioner's accounts in January 1939. The demolition costs were $9,202.04 and salvage recoveries were $24,349.99, all in 1938.

AFE 17843 covers the retirement of yard tracks located at Ayer, Massachusetts. On July 25, 1938, the division engineer requested authority to retire the tracks, for the reason that they were no longer required and that the material which might be salvaged therefrom could be used at other points. Retirement was approved by the executive committee on August 16, 1938. Removal was commenced on August 22, 1938, and completed on September 20, 1938. The division engineer reported completion of the work on November 29, 1938, and on January 24, 1939, the engineering department transmitted its statement of the ledger value of the property retired to the auditor of disbursements. Entries covering the retirement of the tracks were made in petitioner's accounts in February 1939. A further credit to the investment account was made in June 1939. Petitioner's records show demolition costs of $4,889.41 in 1938 and $85.16 in 1939, and salvage recoveries of $18.955.62 in 1938.

AFE 17844 covers the retirement of yard tracks located at Rotterdam, New York. On July 25, 1938, the division enginer requested authority to retire the tracks, for the reason that they were no longer required and that the material which might be salvaged therefrom could be used at other points. Retirement was approved by the executive committee on August 16, 1938. Removal was commenced on September 19, 1938, and was completed May 17, 1939. The division en-

gineer made his report covering the removal of the yards on May 31, 1939, and on May 31, 1941, the engineering department transmitted its statement of the ledger value of the property retired to the auditor of disbursements. Entries recording the retirement of the tracks were made in petitioner's accounts in February 1939, and an adjusting entry was made in 1941. Expenditures for demolition aggregated $552.99 in 1938, and $5,936.85 in 1939. Salvage recovered aggregated $1,691.47, in 1938, and $10,026.09 in 1939.

AFE 17897 covers the retirement of yard tracks located at Nashua, New Hampshire. On September 13, 1938, the division engineer requested authority to retire the tracks, for the reason that they were of no further use and that the retirement would eliminate further maintenance. The retirement was approved by the petitioner's president on October 31, 1938. The work of removing the tracks was commenced on December 17, 1938, and was completed on June 6, 1939. The division engineer made his report of the demolition on July 18, 1939, and on August 16, 1939, the engineering department transmitted its statement of the ledger value of the property retired to the auditor of disbursements. Entries recording the retirement of the tracks in question were made in petitioner's accounts in August 1939. Additional entries were made in December 1939. Expenditures for demolition aggregated $1,068.02 in 1938, and $1,139.93 in 1939. Salvage was recovered in 1939 in the amount of $3,711.66.

AFE 18000 covers the retirement of eight sections of an engine house at Worcester, Massachusetts. The eight sections of the engine house were demolished by a hurricane on September 21, 1938. On December 9, 1938, the division engineer reported that the facility was not then used or required since the locomotives were being serviced at the New Haven Railroad engine house and the destroyed sections would not be rebuilt at that time. He reported that arrangements had been made with a local wrecking contractor to clear up the debris without expense to the petitioner and that the contractor was then clearing and removing the debris, in return for any salvaged material. The retirement was approved by petitioner's president on July 11, 1939. On July 21, 1939, the division engineer made his report to the engineering department, stating that the reason for retirement was that the property had been demolished by a hurricane on September 21, 1938, and was retired from service on September 22, 1938. On July 31, 1939, the engineering department transmitted its statement of the ledger value of the property to the auditor of disbursements, and entries covering the retirement were made in petitioner's books in July of 1939.

AFE 18279 covers the retirement of a portion of the Salem and Lowell Branch between South Middleton and Wilmington Junction, Massachusetts. There had been no passenger service over the line

from September 25, 1932, and no freight service north of North Reading, a station between South Middleton and Wilmington Junction, since May 1935, and for several years prior to that date, operations had been only occasional and for the purpose of reaching the main line. There had been no traffic to and from points between North Reading and Wilmington Junction for more than five years. North Reading, which had been a car load non-agency station since May 1938, was served by a local freight which, when necessary, extended its run from South Middleton to that point. The distance from South Middleton to North Reading was not over one-third of the distance from South Middleton to Wilmington Junction. The traffic was not sufficient to warrant the continuation of the line. In the spring of 1936, the switch connection at the Wilmington Junction end of the branch had been permanently removed and for some time prior to November 7, 1938, the petitioner had maintained a physical barrier on the branch at a point immediately north of the North Reading station. On November 1, 1938, the executive committee authorized the president to apply to the Interstate Commerce Commission for authority to abandon the property, and on November 14, 1938, an application was filed with the Commission. The Commission issued its certificate authorizing abandonment of the line on January 24, 1939. Work of removal was commenced on April 24, 1939, and was completed on May 11, 1939. The division engineer made his report of the removal work under date of January 16, 1940. By memorandum dated May 27, 1940, the engineering department transmitted its statement of the ledger value of the property retired to the auditor of disbursements. Entries recording the retirement were made in petitioner's accounts in November 1939. In May 1940, further entries were made. Expenditures in 1939 for demolition aggregated $2,763.22. Salvage recovered in 1939 amounted to $8,893.48.

AFE 18301 covers the retirement of a portion of the Keene Branch from Elmwood on the east to Keene, New Hampshire, on the west. Application had originally been made to the Interstate Commerce Commission on January 22, 1934, to abandon the approximately 25 miles of railroad between the two points named. On June 21 of 1934, the application was amended, seeking permission to abandon operations over 21.83 miles of the branch, being that portion of the line extending from Keene, New Hampshire, east to Coolridge Crossing. The Commission issued its certificate authorizing abandonment of the operation on March 13, 1935. On October 12, 1937, petitioner applied to the Commission for authority to abandon and retire 23 miles of the branch line, that portion extending from Keene to a point about two miles west of Elmwood. It was stated that there had been no train service on the line from May 1, 1935; that no useful purpose would be served by continuance of the line; that petitioner desired

to dismantle the line before it should get into such condition that it would not be possible to send work trains over it for the purpose of salvaging useful material; and that petitioner desired to get the material for sale or use elsewhere before it deteriorated further. The Commission authorized the dismantling of the branch on November 1, 1938. The remaining 2 miles of the branch had been used for placing a few cars at Coolridge Crossing, until that portion of the line was badly damaged by a flood in April 1938, after which it was not used. It had been petitioner's intention for its application of October 12, 1937, to cover the said two miles, but through oversight that portion of the branch had been omitted. On January 17, 1939, application was made to the Commission for authority to abandon the 2-mile portion of the branch, and such abandonment was authorized by certificate of the Commission on May 15, 1939. The record does not show when removal of the tracks was commenced or when it was completed. The division engineer made his report to the engineering department on October 17, 1940, and on October 28, 1940, the engineering department transmitted its statement of the ledger value of the property to the auditor of disbursements. Entries recording the retirement of the branch were made in petitioner's accounts in November 1939. An adjusting entry was made in October 1940. Expenditures for demolition aggregated $16,676.79 in 1939, and $6,321.04 in 1940. Salvage recovered amounted to $34,694.30.

AFE's 18349 and 18350 cover the retirement of the Milford Branch, which extended from Pepperell, Massachusetts, to Milford, New Hampshire. AFE 18349 related to the portion of the branch in Massachusetts, and AFE 18350 to that in New Hampshire. Application was made to the Interstate Commerce Commission for authority to abandon the entire branch on December 14, 1938. As a basis for retirement, it was stated that no passenger service had been operated since September 7, 1931; that no freight service had been operated on the one portion of the branch since 1932, and none on the remainder since a flood in 1936, except the moving of some cars of ice in 1937; that there was no longer traffic to warrant saving of the line and that it was desired to get the benefit of the salvage. Abandonment was authorized by the Commission on February 27, 1939. Work of removal of the portion of the branch in Massachusetts was commenced on May 16, 1939, and was completed on December 31, 1941. The division engineer made his report on December 18, 1939, and on March 27, 1940, the engineering department transmitted its statement of the ledger value of the property to the auditor of disbursements. Entries recording the retirement of this portion of the branch were made in petitioner's accounts in November 1939. An adjusting entry was made in May 1940. Expenditures for demolition aggregating $2,873.70, $373.78 and

$2,653.13 were made in 1939, 1940, and 1941, respectively. Salvage was recovered in 1939 amounting to $3,671.54. The work of removal of the New Hampshire portion of the branch was commenced May 16, 1939, and was completed on December 22, 1941. The division engineer made a report to the engineering department as to the removal work of the property on December 18, 1939, and on March 26, 1940, that department transmitted its statement of the ledger value of the property to the auditor of disbursements. Entries recording the retirement of this portion of the branch were made in petitioner's accounts in November 1939. In May 1940, further entries were made. Expenditures for demolition aggregating $4,856.22, $393.66, and $750 were made in 1939, 1940, and 1941, respectively. Salvage recovered aggregated $13,207.92 and $798.75 in 1939 and 1940, respectively.

The properties covered by AFE's 17655, 17778, 17843, 17844, 17897, 18000, 18301, 18349, and 18350 were demolished, destroyed, or abandoned prior to 1939. Two-thirds of the property covered by AFE 18279 was abandoned prior to 1939.

## 1940

On the 1940 consolidated return, petitioner claimed, and in computing the operating net loss carry-over, the respondent in his determination of deficiency allowed, loss deductions due to the claimed retirements in that year of various items of roadway property. Sixteen of these items are now in issue, by reason of affirmative allegations by the respondent claiming an increased deficiency. These 16 items, by AFE numbers and cost or I. C. C. inventory value, salvage recoveries, demolition costs and the deductions allowed by the respondent in his deficiency determination, are as follows:

| AFE numbers | Cost or I. C. C. inventory value | Salvage recoveries | Demolition costs | Deductions* allowed by respondent |
|---|---|---|---|---|
| 18279 | $7,786.40 | ($2,713.01) | | $10,499.41 |
| 18301 | (3,703.56) | 1,789.50 | $21,302.10 | 15,809.04 |
| 18227 | 18,906.00 | | | 15,597.25 |
| 18471 | 7,998.00 | 252.05 | 281.98 | 7,423.86 |
| 18554 | 5,142.00 | | | 3,887.59 |
| 18562 | 7,028.00 | | | 5,366.43 |
| 18000 | 18,602.00 | 1,723.15 | 679.74 | 13,611.21 |
| 18006 | 22,496.00 | 5,000.00 | 124.86 | 14,702.83 |
| 18610 | 8,899.80 | | | 8,899.80 |
| 18617 | 37,837.00 | 46.00 | | 31,276.59 |
| 18653 | 69,661.00 | | 35.76 | 59,528.01 |
| 18699 | 11,393.00 | | 587.12 | 9,716.79 |
| 18845 | 11,555.00 | 182.63 | 145.38 | 9,488.57 |
| 18876 | 11,027.00 | | 50.00 | 8,386.08 |
| 18888 | 886,681.34 | 38,906.98 | 15,022.72 | 668,103.15 |
| 18913 | 43,728.00 | | 22.14 | 33,079.69 |
| Total | $1,165,036.98 | $45,187.30 | $38,251.80 | $915,376.30 |

*In arriving at the deductions allowed in his deficiency determination, the respondent adjusted the cost or I. C. C. inventory value of each item of property for pre-March 1, 1913, depreciation and engineering costs.

The item claimed in 1940 under AFE 18279 related to the retirement of a portion of the Salem and Lowell Branch between South Middleton and Wilmington Junction, Massachusetts, previously covered in our findings relating to the retirement claims for 1939.

The item claimed in 1940 under AFE 18301 had to do with retirement of a portion of the Keene Branch from Elmwood to Keene, New Hampshire, previously covered in our findings relating to retirement claims for 1939.

AFE 18227 covers the retirement of a blacksmith shop at Concord, New Hampshire. The blacksmith shop was completely demolished in September 1938, by a hurricane. It was not replaced or rebuilt. The blacksmith operations were thereafter housed in new quarters at the south end of an existing building, through the erection of a brick partition, replacing of a portion of the floor with cinders, installing doors and making changes in lighting, heating, power wiring, and sprinklers. Authority for the expenditure of $17,700 for the purpose of providing new quarters for the blacksmith shop was approved by the budget committee on February 27, 1939, and by the president on March 3, 1939. With respect to the item in question, Form A & B 26, signed by the division engineer on May 6, 1940, shows "date commenced 3–18–40" and "date completed or demolished 4–27–40." The engineering department, on May 17, 1940, transmitted its statement of the ledger value of the property to the auditor of disbursements. Entries recording the retirement of the old quarters were made on the books in July 1940. There were no demolition costs or salvage recoveries.

AFE 18617 covers the retirement of the machinery contained in the blacksmith shop at Concord, New Hampshire. The woodworking machinery, having an original cost of $2,800, in the blacksmith shop at the time of the hurricane was damaged, worn out, or otherwise of no use. The blacksmith shop machinery was damaged when the hurricane wrecked the blacksmith shop. Retirement of the machinery was approved by petitioner's president December 1, 1939. The work of dismantling and retiring the machinery was commenced December 1, 1939, and completed April 23, 1940. The report to the auditor of disbursements was made on May 23, 1940, and entries covering the retirement were made on petitioner's accounts in May 1940. Salvage amounted to $320.15, of which $46 was credited on petitioner's books in 1940 and $274.15 in 1941.

AFE 18471 covers the retirement of an old transfer platform and awning at North Walpole, New Hampshire. The transfer platform and awning had not been in service for some years. They would have in them considerable second-hand material which could be salvaged and made available for use at other points, and their removal

was in the interest of fire prevention and safety, particularly because of their poor condition. The removal and salvage of the platform and awning was approved by petitioner's president on September 8, 1939. The work of removal was commenced September 20, 1939, and demolition was completed on February 17, 1940. The engineering department transmitted its statement to the auditor of disbursements on June 20, 1940, and entries reflecting the demolition and retirement were entered on petitioner's accounts in June 1940. Expenditures for demolition aggregating $176.42 were made in 1939, and $105.56 in 1940. Salvage was recovered in 1940 in the amount of $252.05.

AFE 18554 covers the demolition and retirement of a one-story frame passenger station at Bell Rock, Massachusetts. The structure had been erected in 1886, at a cost of $4,993.26, and was no longer in use as a passenger station. The plastering was down, its chimney top was gone and the roof leaked badly. It was not locally assessed for taxes. It was desired to remove the building and clean up the premises in the interests of safety and fire prevention. Demolition and removal of the building were approved by petitioner's president October 27, 1939. The work was commenced October 30, 1939, and completed November 30, 1939. The work was done by an outside party in return for whatever salvage there might be. Petitioner's real estate bureau transmitted data on the demolition and retirement of the structure to the auditor of disbursements on May 23, 1940, and the entries were made in petitioner's books in May 1940.

AFE 18562 covers the retirement of a portion of the freight house at Chicopee Falls, Massachusetts. The portion of the freight house retired was not in use and had not been used for railroad purposes for some time. The remainder of the freight house was under lease to outside parties. The structure was in extremely poor condition, particularly the unoccupied section. Arrangements were made with one of the lessees of the occupied portion to demolish and remove the unoccupied portion and to install timber end walls in the leased portion, for the material that might be salvaged. Demolition was approved by petitioner's president October 27, 1939. The work was commenced November 15, 1939, and demolition was completed June 19, 1940. The engineering department made its report to the auditor of disbursements on June 27, 1940, and the entries with respect thereto were recorded in petitioner's accounts in June 1940.

AFE 18600 covers the retirement of the track and turntable at Concord, New Hampshire. The retirement and removal of the track and turntable were recommended by the division engineer on August 3, 1939, on the ground that the facility was not then in use and was of no future use, and retirement would eliminate further maintenance and permit sale of salvaged material. The project was approved

by petitioner's executive committee on November 7, 1939. The work of removal was commenced December 4, 1939, and demolition was completed December 28, 1939. The engineering department made its report to the auditor of disbursements on June 6, 1940, and the entries covering the retirement and demolition of the facility were entered on petitioner's accounts in May 1940. Cost of demolition in 1939 aggregated $636.95 and in 1940, $42.79. Salvage recoveries amounted to $1,723.15.

AFE 18606 covers the retirement of a one-story frame passenger station at Marlboro, Massachusetts. Retirement of the station was approved by petitioner's board of directors on August 22, 1939, for the reason that the station was not needed, for passenger train service on the Marlboro Branch had been discontinued and the passenger station had been abandoned. The dates of discontinuance of passenger service and abandonment of use of the station are not shown. The station was sold to outside parties in 1939 for $5,000. The petitioner incurred costs in December of 1939 in connection with the transaction in the amount of $124.86. Petitioner's real estate bureau made its report to the auditor of disbursements on December 12, 1940. Entries covering the retirement and disposition of the station were made in petitioner's books in December 1940.

AFE 18610 covers the retirement of machinery in a passenger car shop at Billerica, Massachusetts. The retirement had to do with changes made in the building in order to effectuate a lease of the building to Johns-Manville Products Corporation. The building was leased to that corporation on January 10, 1939, for a period of 1 year and thereafter until terminated, as provided in the lease. The effecting of the lease required the retirement of shop machinery and repairs to the floor, heating system, and toilet facilities. The project was approved by petitioner's president November 13, 1939. The work was started on January 20, 1939, and was completed February 28, 1939. The engineering department made its report to the auditor of disbursements on September 6, 1940, and the entries covering the matter were made in petitioner's books in November 1940.

AFE 18653 covers the retirement of machinery, boilers, fittings, tanks, etc., at Pintsch Gas Plant, East Cambridge, Massachusetts. Due to the improvement in operation of the new Engine Terminal Power Plant, the boilers in the Pintsch Plant formerly used for stand-by service were no longer required. The purpose of retirement of the machinery, boilers, etc., was to realize on salvage value of scrap on "present high prices." The building was not to be retired. Authority to scrap and salvage the machinery and equipment was approved by petitioner's executive committee December 5, 1939. There is no showing when the work was commenced or when it was com-

pleted. The report was made to the auditor of disbursements on January 10, 1941, and entries covering the retirement were made on petitioner's books of account in December 1940. Costs of demolition in 1939 aggregated $1,193.83, in 1940, $1,883.02, and in 1941, $30.65. There were no salvage recoveries. The work of removal was done by an outside contractor, under a contract dated December 6, 1939.

AFE 18699 covers the retirement of the machinery from an old locomotive shop located at East Somerville, Massachusetts. The old shop had been leased to Zurbach Steel Company and that company requested removal of the boiler house and other unidentified buildings, because no longer required and in order to allow it the benefit of lower insurance rates. The project was recommended by the division engineer on December 20, 1939, and was approved by petitioner's president January 3, 1940. The work was commenced October 1939, and the demolition was completed November 1939. The engineering department made its report to the auditor of disbursements on March 21, 1940, and the entries covering the retirement and demolition were made on petitioner's accounts in March 1940. All disbursements for demolition, aggregating $587.12, were made in 1939. The work was done by an outside contractor.

AFE 18845 covers the retirement of track scales, ash pit, stiff-legged derrick, and two standpipes at Ayer, Massachusetts. These items were operating facilities connected with the yard retired in 1938 and covered under AFE 17843 as a claimed deduction for 1939. Removal and demolition of the items named were commenced August 24, 1938, and completed September 6, 1938. Although the work was not approved by petitioner's president until February 5, 1940, the report by the engineer discloses that they were removed "In connection with the removal of tracks in abandoned Yard at Ayer, Mass. under A. F. E. 17843 * * * in order to utilize Work Equipment used in picking up track material and thus avoid excessive cost in the future to remove these facilities." The engineering department made its report to the auditor of disbursements March 12, 1940, and the entries covering the retirement and demolition of the items named were made in petitioner's accounts in March 1940. The expenditures covering demolition, amounting to $145.38, were made in 1938, and salvage recoveries of $182.63 were also made in 1938. The entries covering cost of demolition and salvage recoveries were originally entered in petitioner's accounts in August and September 1938, but were later transferred by entries made in February 1940 from operating expense accounts to retirement suspense account. By entry recorded in March 1940, the net credit to retirement suspense account, amounting to $37.25, was transferred to profit and loss.

AFE 18876 covers the retirement of a one-story frame passenger station located at Somerville, Massachusetts. Recommendation that the station be retired was made on the ground that the station, which had been erected in 1910, was no longer in use and was in poor condition, having been recently damaged by fire, and by reason of its location, constituted a fire menace. It was not needed for railroad purposes. Emergency authority for removal was approved by petitioner's vice president on December 27, 1939, in order that the building might not be assessed for taxes by the City of Somerville for the year 1940. The project was approved by petitioner's president February 5, 1940. The work of removal was commenced December 28, 1939, and was completed February 7, 1940. The work was done by an outside contractor, at a cost to petitioner of $50. Petitioner's real estate bureau made its report to the auditor of disbursements June 20, 1940, and the entries covering the retirement and demolition were made in petitioner's accounts the same month.

AFE 18888 covers the retirement of a portion of petitioner's Central Massachusetts Branch extending from Oakdale, on the east, to Wheelwright, on the west, both in Massachusetts. There had been no passenger service over the branch since April 1932. Prior to June 1, 1938, a local freight from Boston went as far west as Rutland three days a week if there was traffic. Rutland is located approximately half way between Oakdale and Wheelwright. This train was discontinued on June 1, 1938. Up to the time of the flood in September of 1938, a local freight operated east from Northampton, Massachusetts, through Wheelwright, as far east as Rutland, when there was traffic. After the flood, it did not operate east of Barre Plains. The distance between Wheelwright and Barre Plains is not over one-tenth of the distance from Wheelwright to Oakdale. On November 1, 1938, petitioner's president was authorized to file an application with the Interstate Commerce Commission for authority to abandon the property. The application was filed January 30, 1939. In support of the application, it was represented that there was not sufficient traffic to warrant continuation of the line; that restoration and repair of flood damage would cost $34,400 for the west end of the line, and $5,150 for the east end of the line; and that it was desired "to get the benefit of the $77,500.00 of salvage." Petitioner's application was approved by the Commission on November 7, 1939. The dates on which the removal work was started and completed are not shown. Entries covering the retirement were made in petitioner's accounts in September 1940. Costs of demolition in 1940 amounted to $15,022.72, and in 1941 to $8,210.72. Salvage recoveries, the year or years not being shown, totaled $39,376.24.

AFE 18913 covers the retirement of a portion of the Lawrence engine house. The engine house was damaged by fire on May 2, 1937. The middle section and stalls were destroyed and a section of the east end, near the signal tower, was badly damaged. Removal and retirement was recommended by the division engineer on February 8, 1940, and was approved by petitioner's president on March 1, 1940. The work was done by a local contractor for the salvage that might be recovered. The work was commenced June 10, 1940. Demolition was completed October 25, 1940. The costs to petitioner amounted to $22.14. The record does not show the date the entries covering the retirement of this item of property were made on petitioner's books.

The properties covered by AFE's 18227, 18617, in so far as it relates to woodworking machinery, 18471, 18554, 18845, and 18913 were demolished, destroyed, or abandoned prior to 1939.

The properties covered by AFE's 18617, in so far as it relates to blacksmith shop machinery, 18562, 18600, 18606, 18610, 18653, 18699, and 18876 were demolished, destroyed, or abandoned in 1939. Two-thirds of the property covered by AFE 18279 was abandoned prior to 1939. The remainder was abandoned in 1939. Nine-tenths of the property covered by AFE 18888 was abandoned prior to 1939. The remainder was abandoned in 1939.

### 1941

On the 1941 consolidated return, petitioner claimed, and the respondent in his determination of deficiency allowed loss deductions due to claimed retirements in that year of various items of roadway property. Thirteen of those items are now in issue, by reason of affirmative allegations by the respondent claiming an increased deficiency. These 13 items, by AFE numbers and cost or I. C. C. inventory value, salvage recoveries, demolition costs and the deductions allowed by the respondent in his deficiency determination, are as follows:

| AFE numbers | Cost or I. C. C. inventory value | Salvage recoveries | Demolition costs | Deductions* allowed by respondent |
|---|---|---|---|---|
| 17658 | $6,528.00 | $2,457.25 | $1,687.01 | $5,757.76 |
| 18301 | | 10.39 | 1,695.73 | 1,685.34 |
| 18445 | 5,105.00 | | | 3,859.15 |
| 18447 | 60,233.50 | 1,041.23 | 32,758.58 | 91,950.85 |
| 18448 | 59,826.45 | 924.67 | 20,333.98 | 79,235.76 |
| 18653 | | | 3,071.74 | 3,071.74 |
| 19375 | 5,450.00 | 11.00 | 8.70 | 5,447.70 |
| 19410 | 5,809.00 | | | 4,511.94 |
| 19644 | 30,122.00 | | | 22,784.67 |
| 20112 | 17,198.00 | | 254.48 | 13,614.77 |
| E2360 | 23,222.00 | | | 17,690.63 |
| E2371 | 7,585.00 | 229.80 | | 5,556.95 |
| E2482 | 7,068.00 | | | 5,343.56 |
| Total | $228,146.95 | $4,674.34 | $50,810.22 | $260,510.87 |

*In arriving at the deductions allowed in his deficiency determination, the respondent adjusted the cost or I. C. C. inventory value of each item of property for pre-March 1, 1913, depreciation and engineering costs.

AFE 17658 covers the retirement of the Bristol Branch, extending 12.78 miles from Franklin to Bristol, New Hampshire, of which only 2½ miles extending from Franklin is here involved. The branch was badly damaged by a flood in March 1936, and thereafter there were no operations over it. Application was made to the Interstate Commerce Commission for authority to abandon the property and the Commission issued its certificate to that effect on September 24, 1937. The work of removal began September 22, 1936, and all of the track was removed, except the 2½-mile portion described above. That part of the track was left in place under an arrangement which would permit the Federal Government to lease that track for use in connection with the construction of a flood control reservoir in the vicinity. On May 24, 1940, the United States Engineers' Office advised petitioner that the use of the track would not be required. The track was removed under contract with an outside party and the work was completed by September 20, 1940. Entries covering the retirement of the 2½ miles of the Bristol Branch were recorded in petitioner's accounts in April 1941. Demolition expenditures in 1940 were $1,687.08. Salvage recoveries were $398.30 in 1939, and $2,544.35 in 1940. The 1939 recoveries were not related to the 2½-mile portion of the branch.

The item claimed in 1941 under AFE 18301 had to do with retirement of a portion of the Keene Branch from Elmwood to Keene, New Hampshire, previously covered in our findings relating to retirement claims for 1939 and 1940.

AFE 18445 covers the retirement of petitioner's passenger station at Kittery, Maine, across the Piscataqua River from Portsmouth, New Hampshire. The retirement of the station resulted from the construction of a new highway bridge by the Maine-New Hampshire Interstate Bridge Authority. As constructed, the bridge was a dual purpose bridge which also carried railroad tracks for petitioner's operations. The project was approved by the executive committee August 15, 1939. The work was commenced March 1, 1939, and demolition was completed November 30, 1940. The engineering department made its report to the auditor of disbursements November 26, 1940, and entries covering the retirement were made on petitioner's accounts in September 1941. Under date of October 31, 1940, petitioner was notified that it might begin operating its trains over the new bridge on November 10, 1940.

AFE's 18447 and 18448 cover the retirement of petitioner's bridge over the Piscataqua River from Kittery, Maine, to Portsmouth, New Hampshire. The bridge was no longer needed because it was superseded by a dual purpose highway-track bridge built over the river by the Maine-New Hampshire Interstate Bridge Authority. The petitioner was authorized to operate its trains over the new bridge on a

rental basis. The new bridge was completed in 1940, and on October 31, 1940, petitioner was notified that it might begin running its trains over the bridge on November 10, 1940. Removal of the old bridge was approved by the executive committee August 15, 1939. The work started March 9, 1939, and was completed September 3, 1941. The engineering department made its report to the auditor of disbursements on November 25 and 26, 1940. Entries covering the retirement of the bridge were made on petitioner's accounts in September 1941. Demolition costs in the case of the Maine portion of the bridge covered by AFE 18447 amounted to $12,627.79 in 1940, and $20,130.79 in 1941. Salvage recoveries were $209.65 in 1940, and $831.58 in 1941. Demolition costs of the New Hampshire portion of the bridge, covered by AFE 18448, amounted to $714.70, $16,576.68 and $3,042.60 in 1939, 1940 and 1941, respectively. Salvage recoveries in 1940 were $924.67.

The claim under AFE 18653 relates to the retirement of the machinery, boilers, fittings, tanks, etc., at the Pintsch Gas Plant in East Cambridge, Massachusetts, previously covered in our findings relating to retirement claims in 1940. The deduction as put in issue purporterly covered additional costs of demolition. The costs shown by petitioner's records were $1,193.83 in 1939, $1,883.02 in 1940, and $30.65 in 1941.

AFE 19375 covers the retirement of farm buildings located at East Deerfield, Massachusetts. The buildings were destroyed by fire on October 4, 1940. The petitioner received $11 for the salvage, the understanding being that the purchasers were to tear down the buildings at their own risk and clean up the premises. The engineering department made its report to the auditor of disbursements on February 21, 1941, and entries covering the buildings destroyed were made on petitioner's books in May 1941.

AFE 19410 covers the retirement of a passenger station at West Somerville, Massachusetts. The station was erected in 1864 and had not been used for operating purposes since 1926. The station had been leased to an outside party, who remained in possession until about March 1939. Demolition of the building was approved November 30, 1940. The roof was falling in and the building, in general, was in a very dilapidated condition. For the year 1940 the building was assessed for local taxes at $700. Notice of repossession was posted on the premises on August 3, 1939. Demolition of the structure was by an outside party, at no cost to petitioner, under an agreement that the building be substantially removed on or before January 1, 1941. The engineering department made its report to the auditor of disbursements by memorandum dated January 30, 1941. Entries covering demolition of the station were made in petitioner's accounts in January 1941.

AFE 19644 covers the retirement of a passenger station and freight house at Weirs, New Hampshire. The property was destroyed by fire on December 22, 1939. The City of Laconia, New Hampshire, in consideration of the conveyance of certain parcels of land to it by petitioner, erected a building in which space was provided for station facilities. The engineering department made its report to the auditor of disbursements by memorandum dated March 24, 1941, and entries covering the loss were made on petitioner's books in March 1941.

AFE 20112 covers the retirement of a coal trestle, shed, and track located at East Fitchburg, Massachusetts. Because more economical, a coal loader was installed at East Fitchburg in 1937, and the coal trestle, track, and shed were not thereafter used. Demolition of the trestle, shed, and track was recommended and approved by the engineering department because they had not been used since 1937, were in poor condition and constituted a safety and fire hazard. Demolition was approved by petitioner's president September 8, 1941. The work of demolition was commenced September 22, 1941, and completed February 5, 1942. The track was actually removed in September 1938. The engineering department made its report to the auditor of disbursements by memorandum dated January 3, 1942. The entries covering the retirement were made in petitioner's accounts in December 1941. Petitioner's records show costs of demolition in 1941 of $254.48, and in 1942 of $903.76. They show salvage recoveries of $812.74 in 1938, and $461.71 in 1942.

AFE E 2360 covers the retirement of an overhead bridge at Hampton, New Hampshire. The bridge retired was superseded by a new bridge built by the State of New Hampshire. The project was approved by the petitioner's acting chief engineer on April 15, 1936. The work was started March 15, 1936, and finished September 9, 1936. The report of the work was made to the petitioner's auditor of disbursements by memorandum dated December 5, 1941. The entries covering the retirement of the old bridge were made on petitioner's books in November 1941.

AFE E 2371 covers the retirement of an underpass bridge located at Lawrence, Massachusetts. The old bridge was superseded by a new bridge constructed by the Commonwealth of Massachusetts. The project was approved by petitioner's acting chief engineer on May 23, 1936. The work began June 1, 1936, and was completed November 28, 1936. The report of the work was made to the auditor of disbursements by memorandum dated December 8, 1941. Entries covering the matter were recorded in petitioner's accounts in November 1941. Salvage was recovered in 1936 amounting to $229.80.

AFE E 2482 covers the retirement of an underpass bridge at North Kennebunkport, Maine. This bridge was superseded by a new bridge

constructed as a P. W. A. project in or about 1937. Retirement of the old bridge was approved by petitioner's chief engineer on July 8, 1937. Its actual removal began October 11, 1939, and was completed November 29, 1939. The retirement was reported to petitioner's auditor of disbursements by memorandum dated August 14, 1941, and entries covering the matter were made in petitioner's accounts in September 1941.

The properties covered by AFE's 20112 and E 2360, E 2371, and E 2482 were demolished, destroyed, or abandoned prior to 1939.

The properties covered by AFE's 19410 and 19644 were demolished, destroyed, or abandoned in 1939.

The properties covered by AFE's 17658, 18445, 18447, 18448, and 19375 were demolished, destroyed, or abandoned in 1940.

### *Franklin and Tilton Railroad Retirement.*

The road of Franklin and Tilton Railroad, sometimes hereafter referred to as Franklin, was constructed in 1892. It extended west from Tilton, New Hampshire, to Franklin Falls, and thence across the Merrimack River to Franklin Junction, an over-all distance of some five to eight miles. The petitioner owned and operated two lines of railroad from Concord north along the Merrimac River, one on the east side and one on the west, and the Franklin road connected the two lines at Tilton on the east and Franklin Junction on the west.

After construction of the road in 1892, it was operated by Franklin for approximately three years. In 1895, the road and all other properties of Franklin were leased to Concord and Montreal Railroad, under a 91-year lease, which lease was assigned to the petitioner. Under the lease the petitioner was obligated to maintain the properties, to pay all the taxes, to renew property worn out, and at the termination of the lease, to turn the property back in the same condition as it was when leased.

The outstanding capital stock of Franklin was owned 50 per cent by petitioner and 50 per cent by Northern Railroad. On October 28, 1941, the petitioner's board of directors voted to purchase the stock owned by Northern Railroad, and on November 28, the petitioner applied to the Interstate Commerce Commission for permission to acquire the said stock. On December 23, the Commission authorized the purchase of the stock by petitioner, and on that date the purchase was made. From and after December 23, 1941, and throughout the remainder of the year, Franklin was a member of the affiliated group of which petitioner was the common parent. The results of Franklin's operations for the period from December 23, 1941, through December 31, 1941, were included in the consolidated corporation income and excess profits tax returns filed by the petitioner for 1941.

In 1936, a steel bridge across the Merrimack River and a part of Franklin's road was destroyed by flood. It was washed from its abutments into the river. The petitioner, being of the view that the business over the Franklin road did not justify the cost of replacement, did not want to replace the bridge. On the other hand, the officials of the State of New Hampshire and some local interests were insisting that the road be rebuilt. The petitioner also took the position, at or about that time, that operations by it on both sides of the river north from Concord were not justified, and caused a survey to be made of its line on the east side of the river for the purpose of determining whether that line could, and should, be abandoned. Lengthy negotiations followed between the petitioner, the New Hampshire officials and the local interests and it was agreed that if petitioner would not press application for abandonment of its line on the east side of the river, the demands that the bridge on Franklin's line be rebuilt would be dropped.

After the above agreement had been reached, the petitioner's board of directors, on October 28, 1941, formally voted to abandon its operations over approximately 6,000 feet of Franklin's road running east from Franklin Junction, which sector of the road included the bridge which had previously been destroyed by flood. On November 3, 1941, Franklin's board of directors voted to abandon and retire the said 6,000 feet of roadway property. On November 6, 1941, the petitioner, as lessee, and Franklin, as owner, applied to the Interstate Commerce Commission for a certificate authorizing abandonment and retirement as voted by the directors of the two companies. It was stated in the application that there was no necessity for maintaining the line; that no industries or public facilities were served by it; and that since 1936 there had been no occasion for any service over it. In a return to a questionnaire executed by petitioner and Franklin on December 1, 1941, and filed with the Commission, it was stated that there had been no passenger service on the line since 1926, and no freight service on the portion involved in the application since March 1, 1936; that the said portion had not been operated or maintained since 1936, and since March 1936, the freight house and industrial tracks on the east side of the Merrimack River had been served from the east, through a connection with petitioner's line at Tilton. Forming a part of the return to the questionnaire was an affidavit of publication for 3 weeks of notice by the petitioner and Franklin that they had filed application with the Commission for permission to make the abandonment. On December 16, 1941, the Commission issued its certificate authorizing the abandonment, to be effective in 15 days from that date.

After approval by the Interstate Commerce Commission of the applications for permission to abandon the said stretch of roadway,

the rails and fittings on 4,033 feet of track were removed. This work was done on December 29, 30, and 31 of 1941. The remainder of the 6,000 feet of track, for which permission for abandonment had been granted, was not removed at that time, but was left in place to facilitate the loading and moving of government-owned lumber then stored in that vicinity.

The demolition costs relating to the 4,033 feet of road amounted to $480.73, while salvage amounted to $848.33. The ledger value of the 6,000 feet of road for which abandonment was authorized was $54,932, of which $32,087 was on account of the bridge. Retirement of the segment of the road as authorized was recorded by Franklin in its accounts for December 1941. The difference between ledger value and credit for salvage recovery, plus cost of demolition, or $54,554.40, was deducted as a retirement loss in the consolidated income tax return filed by the petitioner for 1941.

Franklin at all times has been subject to the jurisdiction of the Interstate Commerce Commission. It has never maintained a depreciation account on its books, and it had no retirements of property prior to that here in question. Its entries to cover the instant retirement were prepared to conform with the Commission's requirements and reflected a breakdown by primary accounts of the ledger value of the property retired.

The useful life of the property ended and it was abandoned prior to December 23, 1941.

In determining the deficiency, the respondent disallowed the loss deduction of $54,554.40 as claimed, on the ground that the loss was sustained prior to December 23, 1941, and was not, therefore, a proper deduction on the consolidated return.

OPINION.

The question is as to the years for which the deductions due to the retirement of the above-listed properties are allowable. As shown by the facts, the occasions of their retirement were their destruction or damage by fire, flood, and hurricane, the ending of their useful life by reason of the construction of substituted facilities at public expense, such as the bridge across the Piscataqua River at Portsmouth, New Hampshire, and the underpass and overpasses built by P. W. A. and their being scrapped or abandoned, as in the case of tracks and yards no longer needed or of woodworking machinery which had worn out.

In section 23 (f) of the Internal Revenue Code,[6] it is provided that in the case of corporations a loss is deductible in the year sustained.

---

[6] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\*        \*        \*        \*        \*        \*        \*

(f) LOSSES BY CORPORATIONS.—In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

The petitioner makes no claim that deductions for losses such as those here involved, if they are to be allowed under section 23 (f), must be taken for the year of destruction or of the ending or loss of useful life. Its contention is, however, that the deductions here claimed are not loss deductions allowable under section 23 (f), but are depreciation deductions allowable under section 23 (1),[7] and there is no provision restricting the deductions to the year or years in which the items of property covered thereby were, in fact, destroyed, demolished, or abandoned, but that the year of deductibility is fixed and determined by the time of accounting therefor on its books. It undertakes a demonstration of the soundness of its position, by citing *Chicago & North Western Railway Co.*, 39 B. T. A. 661, affd., 114 F. 2d 882, to the effect that the statute merely provides for "a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business" and that the intent of the statute is satisfied by any method of accounting which will enable the taxpayer to arrive at "a reasonable allowance" for depreciation "and does not require the taxpayer to devise a system of accounting which will purport to reflect the amount of dollars worth of depreciation with absolute certainty." On the basis of that pronouncement by the court, the petitioner reasons to the desired conclusion as follows: That it employs the retirement method of accounting which method of accounting has been held to satisfy the standard of reasonable business certainty; that the deductions taken in its return have always followed such accounting, in that "when in the regular course of business the accounting for the retirement or any other property change is reflected in the accounts it is in that same year reflected in the income tax returns," all of which is within the requirements of the statute, since under section 41 of the Internal Revenue Code net income, for Federal income tax purposes, is to be computed and reported "in accordance with the method of accounting regularly employed in keeping the books" of the taxpayer.

The argument so made, particularly when related to the retirement deductions here involved is, in our opinion unrealistic and without merit. In the first place, section 41, *supra*, places a proviso to the proposition stated, to the effect that the method of accounting must be such that it will if consistently adhered to clearly reflect income and in the second place the soundness of the method of accounting employed is no sesame as to items in respect of which entries are made in disregard thereof. It is true that under retirement accounting entries reflecting depreciation, as such, have no place on the books, and this is true because depreciation sustained is absorbed or ac-

---

[7] (1) Depreciation.—A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

    (1) of property used in the trade or business, or

    (2) of property held for the production of income.

counted for by charging to expense various expenditures which under other methods of accounting would be capitalized and by the crediting to the appropriate capital account at the time of retirement the original cost of the unit of property retired and the making of a corresponding charge to expense, or profit and loss, the theory being that although depreciation is not charged as such, the capital accounts will, under the retirement method of accounting, as reasonably reflect the investment in roadway properties at any given date as would be true if specifically designated depreciation accounts were established and maintained under some other acceptable method of accounting. In other words where various expenditures of a capital nature are currently charged to expense and the property items which are carried in the capital account are eliminated or written out of that account when retired, the result is comparable to the writing out of a reasonable allowance for depreciation and the writing off of capital items lost, destroyed, scrapped, or abandoned under a method of accounting where depreciation and losses are accounted for as such. That, however, is a far cry from saying that the use of the retirement method of accounting contemplates or permits the treating of the date of entry of the results of retirement on the books of account as the date of retirement itself. The function of book entries is to give a true reflection of the business transacted including the transaction dates and the results thereof and when they give out any other picture they do not represent proper accounting or supply the proper basis for reporting income. Income must be reported on an annual basis and as reported must reflect "the net result of all the taxpayer's transactions during" the taxable year, not of some other year. *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359. Also it is settled law that for the purpose of reporting income the accounting requirements prescribed by the Interstate Commerce Commission under the acts to regulate commerce must, in case of conflict, yield to the requirements of the income tax statutes and the regulations promulgated pursuant thereto. *Old Colony Railroad Co.* v. *Commissioner*, 284 U. S. 552. And where wear and tear and obsolescence constitute a factor in determining net income the allowance or deduction therefor must reasonably represent the wear and tear and obsolescence incurred or sustained in the year in question and "it is not given to parties to make choice as to the years in which they will take reductions." *Kansas City Southern Railway Co.* v. *Commissioner*, 52 F. 2d 372. To the extent, then, that a claimed allowance for depreciation in a given year is reflected by the retirement of an item of property which in fact was retired in some other year, such allowance can in no way be regarded as a "reasonable allowance for the exhaustion, wear and tear of property" for the year claimed.

From the above, we think it apparent that it matters not whether it be said that the deduction allowable by reason of the retirement of an item of roadway property is deductible under section 23 (f), *supra*, as a loss, or under section 23 (1), *supra*, as depreciation or obsolescence. The year for which the deduction is allowable and the amount of the deduction remain the same. The year is still the year of retirement, namely, the year of destruction or abandonment, and the amount is basis less salvage value, and under the retirement method of accounting basis is the original cost of the item retired, undiminished by the depreciation which the particular item may have sustained during its useful life.

Where the retirement is occasioned by destruction by fire, flood, or the wrecking or scrapping of an item of property, the year of retirement is normally easy to determine. Where, however, the retirement is the result of abandonment or loss of useful life without demolition or physical destruction, determination of the year of retirement is sometimes more difficult. Ordinarily there must be an intention to abandon, evidenced by some act, and such intention and act are to be ascertained from the facts and surrounding circumstances. Nonuser alone is not sufficient. *Minneapolis, St. Paul & Sault Ste. Marie Railway Co.*, 34 B. T. A. 177, and *W. B. Davis & Son, Inc.*, 5 T. C. 1195. It has been held, however, that an act of abandonment alone is sufficient. *Mine Hill & Schuylkill Haven Railroad Co.* v. *Smith*, 184 F. 2d 422. And further, the prior approval by the Interstate Commerce Commission of an application for abandonment is not, in and of itself, a prerequisite to an income tax deduction based on abandonment. *Mine Hill & Schuylkill Haven Railroad Co.* v. *Smith*, *supra*, and *Minneapolis, St. Paul & Sault Ste. Marie Railway Co.*, *supra*. Nor is it essential to abandonment that actual demolition occur within the same taxable period as the abandonment. *Minneapolis, St. Paul & Sault Ste. Marie Railway Co.*, *supra; Fraser Brick Co.*, 10 B. T. A. 1252; and *Kilby Car & Foundry Co.*, 4 B. T. A. 1294. In fact, it might well be that unless the property as it existed represented some obstruction or fire or safety hazard or there was a desire to realize on salvage, there never would be any occasion to demolish the property at all.

*Property Retirements Claimed by Petitioner for 1939 Which Are Now in Issue under Respondent's Claim for an Increased Deficiency.*

Retirements under AFE's 17655, 17778, 17843 were not only determined upon prior to 1939 but physical demolition was actually completed prior to 1939. AFE 17844 covered yard tracks at Rotterdam, New York. It was decided in 1938 that they were no longer required and that the salvage could be used at other points. There was no

question of Interstate Commerce Commission approval. Actual demolition was started in September 1938. After 1938 the property had no existence except as salvage. The claim of deduction in 1939 is not well taken. AFE 17897 covered yard tracks at Nashua, New Hampshire. The facts are parallel to those relating to the Rotterdam yards and the retirement deduction falls in 1938. AFE 18000 covers eight sections of an engine house at Worcester which were demolished by hurricane on September 21, 1938. On December 9, 1938, the division engineer reported that petitioner's locomotives were being serviced at the New Haven Railroad engine house, that the destroyed sections would not be rebuilt at that time and that arrangements had been made with a local wrecking company to clear up the debris for any material salvaged. This property did not exist after the 1938 hurricane and respondent's claim for disallowance must be approved. AFE 18301 covers the retirement of approximately 25 miles of line between Elmwood and Keene, New Hampshire. Abandonment of operations over most of the line had been approved by the Interstate Commerce Commission as early as March 13, 1935, and physical dismantling of 23 of the 25 miles was applied for on October 12, 1937, and approved by the Commission November 1, 1938. Except for the 2 miles at the east end, there had been no train service after May 1, 1935, and none over the 2-mile stretch after the flood in April 1938. Request for authority to dismantle the 2 miles was omitted from the October 12, 1937, application through oversight. It was formally approved May 15, 1939, on application of January 17, 1939. The application indicated a fear that if removal of the tracks should be delayed, it might not be possible to get work trains over the line. That the deduction in this instance falls in a year prior to 1939 is fully supported by the decisions in *Minneapolis, St. Paul & Sault Ste. Marie Railway Co., supra*, and *Mine Hill & Schuylkill Haven Railroad Co.* v. *Smith, supra*. The Milford Branch between Pepperell, Massachusetts, and Milford, New Hampshire, covered by AFE's 18349 and 18350, is comparable to the Elmwood-Keene line above. The facts amply establish actual abandonment prior to 1939.

The claim under AFE 18279 presents a slightly different picture. That claim covers that portion of the Salem and Lowell Branch between South Middleton and Wilmington Junction. There is no question, we think, that there was actual abandonment of that portion of the line from North Reading to Wilmington Junction long prior to 1939. As to the portion between South Middleton and North Reading, the proof is not definite. So far as we know, there were operations when necessary over that portion of the line until the Interstate Commerce Commission authorized abandonment on January 24, 1939. The burden to show otherwise was on the respondent.

We do not have the mileage of the entire branch, nor of that from South Middleton to North Reading. On Exhibit E, which is a railroad map and, as we understand is not drawn to scale, the said portion might possibly be no more than one-fourth of the whole. Under the principle of *Cohan* v. *Commissioner, supra*, however, we have found that it represents one-third of the whole and to that extent the deduction is allowed for failure of proof to the contrary on the part of the respondent.

*Property Retirements Claimed by Petitioner for 1940 Which Are Now in Issue under Respondent's Claim for an Increased Deficiency.*

We have found as a fact that the properties covered by AFE's 18227, 18471, 18554, 18845, 18913, and by 18617 in so far as it relates to the woodworking machinery were demolished, destroyed, or abandoned prior to 1939, and on the basis of those findings the deductions claimed thereunder must be eliminated in computing any net operating loss carry-over to 1941. The blacksmith shop covered by AFE 18227 was completely demolished by hurricane in 1938. The transfer platform and awning at North Walpole, New Hampshire, covered by AFE 18471, had not been in use for some years prior to 1939 when removal was commenced. Its demolition at that particular time is of no significance as the basis for the claimed deduction, the reason for demolition being that it was in the interest of fire prevention and safety. Even then removal proceeded at a leisurely rate for a structure the original cost or I. C. C. inventory value of which was $7,998, work of demolition being commenced on September 20, 1939, and completed February 17, 1940. The facts relating to demolition of the old passenger station at Bell Rock, Massachusetts, covered by AFE 18554, are for the purposes here the same as those relating to the North Walpole platform and awning. As to the track scales, ash pit, stiff-legged derrick, and standpipes at Ayer, Massachusetts, covered by AFE 18845, no elaboration on the facts is required. They were no longer in existence after 1938. Neither is any elaboration required as to the portion of the engine house at Lawrence, Massachusetts, covered by AFE 18913, the property in question having been destroyed by fire in 1937. The fact that the work of removing the debris was not done until 1940 supplies no basis for the deduction in that year. Similarly the facts show that at and after the hurricane in September 1938 the woodworking machinery covered by AFE 18617 was damaged, worn out or otherwise of no use.

The properties covered by AFE's 18562, 18600, 18606, 18610, 18653, 18699, and 18876 were, we think, and we have so found, demolished, destroyed, or abandoned in 1939, and for the purpose of computing and determining the net operating loss carry-over, if any, to 1941, the

deductions in question are allowable for 1939 rather than 1940, as claimed by petitioner. While it appears to be the fact that the portion of the Chicopee Falls freight house covered by AFE 18562 had not been in use for some time, a portion of the station was under lease to outside parties and so far as here shown, it was not until 1939 action with respect to the unused portion was required or indicated. It does appear, however, that the retirement should be accounted for in 1939 and not in 1940, as claimed by the petitioner. The lessee was to do the work without cost to petitioner other than such salvage as might be recovered. These arrangements had been concluded in 1939. We do not feel, however, that respondent has borne the burden of proving that the loss occurred prior to 1939. Similarly, we do not feel that respondent has established a factual basis for concluding that the track and turntable at Concord, New Hampshire, covered by AFE 18600, were abandoned prior to 1939. The facts do show, however, that they were demolished in 1939, and accordingly there is no proper basis for petitioner's claim of deduction for 1940. As to the station at Marlboro, Massachusetts, covered by AFE 18606, it was an obvious loss in 1939. It was sold in October of that year to outside parties for $5,000. Similarly we think the deduction covering the machinery in the passenger car shop at Billerica, covered by AFE 18610, falls in 1939. Demolition or salvaging of the machinery was started in 1939 and completed in 1939, to effectuate a lease of the building on January 10, 1939, to Johns-Manville Products Corporation. The respondent has not shown a factual basis for the deduction in any year prior to 1939. The same reasoning covers the claimed deduction relating to the machinery, etc., in the Pintsch Gas Plant at East Cambridge, Massachusetts, under AFE 18653. The scrapping of the machinery for salvage was determined upon in 1939, because its functioning had been superseded by that of a new plant, but respondent has not shown that this occurred prior to 1939. The situation covered by AFE 18699 is on the record the same as that covered by AFE 18610. The building was occupied under lease by an outside party and scrapping of the machinery was determined upon and commenced in 1939 and completed in 1939 to facilitate the occupancy of the premises by the lessee. The respondent has not established a factual basis for the deduction for a prior year.

The deduction for the retirement of the station at Somerville, Massachusetts, covered by AFE 18876, in our opinion, properly falls in 1939. It was damaged by fire, apparently in 1939. Even though its removal was not formally approved by petitioner's president until 1940, we think it clear that the matter was determined in 1939 since the work of removal was done for $50 under contract with an outside party and was actually started in 1939. So far as shown, there was no salvage.

The picture reflected by AFE 18888 is much the same as that covered by 18279. AFE 18888 covers the retirement of that portion of petitioner's Central Massachusetts Branch between Oakdale and Wheelwright. On the facts, there was, in our opinion, actual abandonment by petitioner of all of the line in question except that between Wheelwright and Barre Plains prior to 1939. Applying the doctrine established in *Cohan* v. *Commissioner*, *supra*, we have found as a fact that the distance from Wheelwright to Barre Plains was not over one-tenth of the entire mileage between Wheelwright and Oakdale. Authority to abandon that portion of the line was requested and received in 1939, and the respondent has not supplied a factual basis for the deduction relating thereto for any year prior to 1939.

The basis for the deductions claimed in 1940 with respect to the retirements covered by AFE's 18279 and 18301 is not apparent from the record. As to the property covered by AFE 18279, we have already determined that as to all of the line except that between South Middleton and North Reading the deduction properly falls in some year or years prior to 1939. Since the deduction for the retirement of the property itself was claimed in 1939, the deduction claimed for 1940 presumably was based on adjusting entries on petitioner's books to cover the work-out of actual costs of demolition and salvage recoveries. The facts indicate such costs and recoveries were in 1939. Accordingly, any deductions therefor are allowable in 1939 and not in 1940. With reference to the deductions claimed in 1940 under AFE 18301, the situation is comparable. We have already concluded that the line was abandoned prior to 1939 but the facts show demolition costs for 1939 and 1940 and salvage recoveries in a year not shown. Petitioner accounted for most of the salvage in 1939. Accordingly, we will not, on the proof here, disturb its accounting for salvage. The deductions based on adjusting entries to cover costs of demolition should be made effective for the years shown in our findings of fact.

*Property Retirement Claimed by Petitioner for 1941 Which Are Now in Issue under Respondent's Claim for an Increased Deficiency.*

The properties covered by AFE's 19410 and 19644 were, we think, and have so found, demolished, destroyed, or abandoned in 1939, and for the purposes here, the deductions therefor are allowable for 1939 rather than 1941, as claimed by petitioner. While the station covered by AFE 19410 had not been used for railroad purposes since 1926, the facts show that it was under lease to an outside party until March 1939. Formal notice of repossession was posted August 3, 1939. When repossessed the roof was falling in and the building was in a very dilapidated condition. Such being the situation, actual demolition in 1940 by an outside party at no cost to petitioner, there is in

our opinion no factual basis for the claimed deduction for any year after 1939. As to the passenger station and freight house at Weirs, New Hampshire, covered by AFE 19644, it is sufficient to note that the property was destroyed by fire on December 22, 1939.

The properties covered by AFE's 17658, 18445, 18447, 18448, and 19375 were, we think, and have so found, demolished, destroyed, or abandoned in 1940, and for the purposes here, the deductions therefor are allowable for that year rather than 1941, as claimed by petitioner. The claimed deduction based on AFE 17658 relates to 2½ miles of the line between Franklin and Bristol, New Hampshire. The line was badly damaged by flood in March of 1936 and the work of removal began on September 22, 1936. Removal was authorized or approved by the Interstate Commerce Commission on September 24, 1937. The 2½ miles here involved were left in place under an arrangement with the Federal Government for possible use in connection with the construction of a flood control reservoir. Petitioner was notified on May 24, 1940, by the United States Engineers' Office that use of the track would not be required. Such being the facts, we conclude that the claimed deduction is allowable for 1940 and not for 1941, as claimed.

The deductibility of the items claimed under AFE's 18445, 18447, and 18448 is controlled by the same related facts. A new dual purpose highway and railroad bridge was constructed over the Piscataqua River between Portsmouth, New Hampshire, and Kittery, Maine, by the Maine-New Hampshire Interstate Bridge Authority under an arrangement permitting petitioner to run its tracks and trains over the bridge on a rental basis. Completion of the new bridge and the beginning of its use by petitioner in November 1940 ended the useful life of its old station at Kittery, Maine, covered by AFE 18445, and of its old bridge over the Piscataqua River, covered by AFE's 18447 and 18448. The deductions therefor are accordingly allowable for 1940 and not 1941, as claimed by petitioner.

With reference to the deduction claimed under AFE 19375, it is sufficient to note that it covered farm buildings located at Deerfield, Massachusetts, which buildings were destroyed by fire in 1940. Accordingly the deduction falls in 1940 and not in 1941, as claimed.

Our findings of fact and what has already been said with respect to petitioner's 1940 claim under AFE 18301 also cover the deduction claimed for 1941. As put in issue the deduction under AFE 18653 purportedly covered additional costs of demolition. The costs of demolition and the years thereof are shown in our findings of fact. Deductions therefor should be made effective for the years shown.

We have found as a fact that the properties covered by AFE's 20112, E 2360, E 2371, and E 2482 were demolished, destroyed, or abandoned prior to 1939 and on the basis of those findings the deductions claimed

thereunder must, for the purposes here, be eliminated. The coal trestle, shed, and track at East Fitchburg, Massachusetts, covered by AFE 20112, had been abandoned in 1937, when it was superseded by a new coal loader which had been installed. Except as to the track, which was removed in 1938, the property was allowed to stand and deteriorate until September 1941, when it had become a safety and fire hazard and was removed. The delay in wrecking and removing the trestle and shed does not in our opinion supply a proper basis for the retirement deduction in either of the years here involved. That the deductions claimed with respect to the demolition of the properties covered by AFE's E 2360, E 2371 and E 2482 are not allowable here is, we think, obvious. The fact that the Interstate Commerce Commission did not until 1941 get around to the matter of issuing instructions as to the manner in which demolition of the properties should for its purposes be entered on petitioner's books supplies no basis for taking deductions, for income tax purposes, in any year other than that in which the properties were actually demolished and eliminated from petitioner's assets. *Old Colony Railroad Co.* v. *Commissioner, supra.*

### Franklin & Tilton Railroad Retirement.

The question is whether the loss to Franklin due to the destruction and abandonment of its bridge over the Merrimack River and 6,000 feet of its roadway extending east from Franklin Junction was sustained between December 23, 1941 and December 31, 1941. If it was sustained during that period the petitioner is entitled to the deduction claimed.

With respect to the bridge, any conclusion that the loss was not sustained in 1936 would be obviously artificial. The petitioner, in its proposed findings and argument on brief, refers to the flood as having damaged the bridge and indicates that the problem in so far as the bridge was concerned was merely one of repairs. It then reasons that there could be no determination of the appropriate classification of the charge-off until 1941. The facts are, however, that the bridge was washed from its abutments by the flood of 1936 and fell into the river, and thereafter it had no use or value other than salvage. The final results rather indicate that the real problem was that of removing the wrecked bridge from the river. The loss occurred at the time of the flood in 1936, and there is no factual basis for deduction of the loss sustained for the period December 23, 1941 to December 31, 1941.

As to the roadway, it appears that both petitioner and Franklin had prior to December 23, 1941, decided formally upon abandonment and retirement of the entire stretch of road here in controversy. The objection by local and state authorities had been removed. Appli-

cation had been made to the Interstate Commerce Commission for approval of the course of action determined upon and that approval had been given. It is accordingly our conclusion that the action of the respondent in disallowing the deduction claimed was well taken. *Mine Hill & Schuylkill Haven Railroad Co.* v. *Smith, supra,* and *Minneapolis, St. Paul & Sault Ste. Marie Railway Co., supra.*

*Decision will be entered under Rule 50.*